## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                          Case No. 15-32588-WRS
                                               Chapter 7
DEBORAH J. TAYLOR,

      Debtor

JAMES KERN, et al.,

      Plaintiffs                          Adv. Pro. No. 16-3007-WRS

  v.

DEBORAH H. TAYLOR,

      Defendant

### <u>MEMORANDUM DECISION</u>

This adversary proceeding is before the Court on the motion to dismiss filed by

Defendant Deborah Taylor, the Debtor in the underlying Chapter 7 case. (Doc. 9). The Plaintiffs

seek a determination that debts in the amount of roughly $2 million allegedly owed by the

Defendant are non-dischargeable under 11 U.S.C. §§ 523 (a)(2)(A), (a)(2)(B), and (a)(4). The

Plaintiffs have filed a response opposing the motion to dismiss, and the Defendant has filed a

reply. (Docs. 12 & 14). For the reasons set forth below, the Defendant's motion is GRANTED

IN PART and DENIED IN PART.

# I.  FACTS & PROCEDURAL HISTORY

## A.  Introduction

This case revolves around two failed real estate projects that the Plaintiffs invested in and the Defendant managed.  The first project, Maple Village Apartments, was invested in by the following Plaintiffs: G&L Investments – Maple Village, LLC ("G&L"); JK Investments – Maple Village, LLC ("JK"); JP Investments – Maple Village, LLC ("JP"); JS Investments – Maple Village, LLC ("JS"); and Knecht Investment Group – Maple Village, LLC ("KIG").  (Doc. 1, pp. 1-2).  Whenever possible, this opinion will refer to these Plaintiffs collectively as the "MV Plaintiffs."

The second project, Courtyard Apartments, was invested in by the following Plaintiffs: James Kern, Elise Kern, John Simmons, James Pridgen, Ginger Pridgen, Gary Knecht, David Tucker, John Phillips, and Michael Doughty.  (Doc. 1, pp. 1-2).  Again, whenever possible, this opinion will refer to these Plaintiffs collectively as the "Courtyard Plaintiffs."

Defendant Deborah Taylor ("Defendant") was a managing member of Sycamore Management Group ("Sycamore") and a member of an entity known as Sytco, LLC ("Sytco").  Sycamore was the company hired to manage the two real estate projects.

## B.  Maple Village Apartments

### 1.  Investment and Purchase

In 2006, Matthew Bostic ("Bostic"), Defendant's brother, approached certain MV Plaintiffs (or their members) and pitched the Maple Village Apartments project as an investment

opportunity "that would yield high rates of return." (Doc. 1, p. 7). Together with Sycamore, the MV Plaintiffs (except KIG) formed an entity known as Sycamore Investment Group – Maple Village, LLC ("Maple Village") in November 2006 and invested $250,000 each.[1]  Maple Village's members executed an operating agreement in March 2007 that appointed Defendant as Maple Village's manager and stated that the purpose of Maple Village was to acquire and operate the Maple Village Apartments. (Doc. 1, p. 6). Also in March 2007, Maple Village and KIG entered into a tenancy in common agreement to acquire the Maple Village Apartments.[2]  Maple Village was appointed as the managing co-tenant of Maple Village Apartments. Maple Village, KIG, and Sycamore entered a management agreement in which Sycamore would be responsible for the management of the Maple Village Apartments. (Doc. 1, p. 6).

On March 22, 2007, Maple Village and KIG executed a promissory note in the amount of $10,825,000 to Barclays Capital Real Estate (together with its assignees, the "Lenders") to finance the purchase of Maple Village Apartments. Maple Village and "Knecht"[3] executed a loan agreement and mortgage in favor of the Lenders, and Defendant executed a guaranty of the note and loan agreement. (Doc. 1, pp. 7-8).

---

[1]  G&L only invested $118,500.

[2]  The complaint is silent on the amount of KIG's investment, but discloses it was to receive a 9.65% ownership interest in Maple Village Apartments compared with Maple Village's 90.35% interest based on their contribution amounts. (Doc. 1, p. 6).

[3]  The complaint says "Knecht," which it uses as shorthand to refer to Gary Knecht (a Courtyard Plaintiff). (Doc. 1, p. 7, ¶ 28). Gary Knecht is a member of KIG, but the complaint alleges no direct personal relationship between Gary Knecht and Maple Village. It is possible that the complaint intended to say KIG instead.

-3-

## 2. Management

Defendant allegedly failed to make distributions routinely or, when she did make distributions, failed to comply with Maple Village's operating agreement in doing so. (Doc. 1, p. 11). Defendant allegedly commingled funds belonging to Maple Village with funds that were received from other properties controlled or managed by Sycamore. The MV Plaintiffs assert that the other properties had different ownership structures than Maple Village and that the commingling of the funds deprived them of funds they were entitled to. The commingling transfers were not reflected in the financial reports Defendant provided to the MV Plaintiffs. (Doc. 1, p. 11).

Defendant also allegedly caused Maple Village to accept new members without notice to, or consent of, the other members of Maple Village. This was in violation of Maple Village's operating agreement. (Doc. 1, p. 11). Finally, Defendant allegedly caused Maple Village to enter at least two unapproved financial transactions outside the ordinary course of business that obligated Maple Village to Sycamore in the amount of at least $288,000. This was also in violation of Maple Village's operating agreement. (Doc. 1, p. 12).

## 3. Default and Foreclosure

On December 2009, the Lenders sent Defendant a notice of default indicating that Maple Village and KIG had failed to meet their payment obligations under the promissory note. On February 9, 2010, and on December 6, 2012, Defendant received demand letters from the Lenders' counsel, which indicated that the promissory note was still in default and requested immediate payment to cure. On January 15, 2013, the Lenders sent Defendant a letter indicating

-4-

that it was accelerating the overall indebtedness on the promissory note. On February 12, 2013, the Lenders foreclosed on their mortgage and sold the Maple Village Apartments for $12,508,848. Defendant did not inform the MV Plaintiffs of any of the Lenders' communications or the foreclosure sale. (Doc. 1, p. 8).

### 4. Defendant's Post-Foreclosure Activity

Defendant allegedly "verbally misrepresented to MV Plaintiffs, including Kern, Simmons, and Pridgen," that the Maple Village Apartments were continuing to operate as before "on numerous occasions leading up to and following the foreclosure sale[.]"[4] (Doc. 1, p. 10).

Defendant allegedly made distributions to some of the MV Plaintiffs following the foreclosure of the Maple Village Apartments. On May 12, 2013, Defendant distributed $7,418.39 to Gary Knecht (pursuant to his membership in KIG) that was drawn from Sytco. Defendant also distributed $8,134 each to JS and JP, though the complaint is silent as to precisely when these were made. (Doc. 1, p. 10).

On August 12, 2013, Defendant allegedly provided "Plaintiff Kern" with a "wholly fabricated financial statement" purporting to show the activity of Maple Village Apartments through June 2013. Defendant provided similar materials to "Plaintiffs Simmons and Pridgen" at a subsequent meeting. (Doc. 1, pp. 9-10). The Plaintiffs assert this was intended to prevent the MV Plaintiffs from discovering that the property had been lost in foreclosure. (Doc. 1, p. 10).

---

[4] The Kerns, the Pridgens, and John Simmons are all Courtyard Plaintiffs whose connection to the Maple Village Apartments is unclear from the complaint.

## C. Courtyard Apartments

### 1. Investment and Purchase

Bostic formed Sycamore Investment Group – Decatur, LLC ("Decatur LLC")[5] as its sole initial member on December 17, 2007, and assigned half his interest in Decatur LLC to Defendant the following day. Bostic pitched the Courtyard Apartments "as an investment opportunity that would yield high rates of return." (Doc. 1, pp. 13-14). In April 2008, Bostic and Defendant sold membership interests in Decatur LLC to the Courtyard Plaintiffs in return for investments ranging from $50,000 to $400,000 each. The members of Decatur LLC executed its operating agreement appointing Defendant as its managing member, and stating that the purpose of Decatur LLC was to acquire and operate the Courtyard Apartments. Decatur LLC and Sycamore entered an agreement in which Sycamore would be responsible for the management of the Courtyard Apartments. (Doc. 1, pp. 12-13). Decatur LLC obtained a loan for $6,270,000 and reportedly contributed $2,167,000 of its own capital to finance the purchase of Courtyard Apartments. Decatur LLC purchased the Courtyard Apartments on April 28, 2008 for $7,950,000. (Doc. 1, p. 14).

### 2. Management

Defendant allegedly commingled Decatur LLC's funds with funds belonging to other entities such as Sycamore and Sytco, as well as funds from other properties that Sycamore

---

[5] In their response to the motion to dismiss, the Plaintiffs refer to Decatur LLC as "Sycamore Investment Group – Courtyard, LLC." (Doc. 12, p. 3). Because the Decatur LLC name is used in the complaint, the Court will use it in this opinion.

managed.  (Doc. 1, pp. 14 and 16).  Defendant paid Sytco at times to perform the same property management services that Sycamore was being paid to perform.  Defendant and Bostic "routinely and fraudulently misrepresented" the status of the Courtyard Plaintiffs' investments in Decatur LLC.  (Doc. 1, p. 14).

After the Courtyard Apartments were purchased, Defendant allegedly added new members and capital to Decatur LLC, including Plaintiffs Michael Doughty and John Phillips, while simultaneously paying out capital to other members.  This was done without the knowledge of the other Courtyard Plaintiffs and in violation of Decatur LLC's operating agreement.  It also served to dilute the membership interests of the other Courtyard Plaintiffs. (Doc. 1, pp. 14-15).

Defendant allegedly misrepresented the source of a dividend payment made to Gary Knecht on May 12, 2013.  The payment "purportedly represented profits related to the Courtyard Apartments and Maple Village Apartments," but in reality was drawn from Sytco.  (Doc. 1, p. 15).  Defendant also allegedly embezzled funds from Decatur LLC.  The statements from the Courtyard Apartments' account allegedly reflect that Defendant used Decatur LLC's funds to pay for personal expenses and assets, such as jewelry, out-of-town travel expenses, and tuition at show choir camp.  (Doc. 1, pp. 15-16).  Finally, Defendant allegedly refused to recognize contributions by Gary Knecht that were made after Decatur LLC purchased the Courtyard Apartments.  Knecht apparently contributed $153,000, but Defendant only attributed $127,000 to

his account.  (Doc. 1, p. 16).  The complaint alleges other contributions were made and not recognized by Defendant, but does not provide any specifics about them.

The Courtyard Apartments were sold at a foreclosure sale in January 2016.  (Doc. 1, p. 17).

### D.  Bankruptcy and Adversary Proceeding

The Plaintiffs sued Defendant in state court for fraud, breach of contract, and breach of fiduciary duty in December 2013, seeking over $2 million that they allegedly invested; the lender for the Maple Village Apartments separately sued Defendant for breach of the guaranty Defendant provided on Maple Village's loan.  (Doc. 12, p. 3).  These lawsuits are still pending.

Defendant filed Chapter 7 bankruptcy on September 17, 2015.  (Case No. 15-32588, Doc. 1).  She did not list any of the Plaintiffs as creditors in her schedules.  (Case No. 15-32588, Doc. 12).  The trustee filed a report of no distribution, and no proofs of claim have been filed in her case.  (Case No. 15-32588, Doc. 32); *see* FED. R. BANKR. P. 2002(e).

The Plaintiffs initiated this adversary proceeding on February 2, 2016, alleging that their state court claims are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(4).[6]  They assert that absent Defendant's misrepresentations and false financial statements, they would not have invested in Maple Village and Decatur LLC, would not have allowed

---

[6]  In the complaint the § 523(a)(2)(A) claim is Count I, the § 523(a)(2)(B) claim is Count II, and the § 523(a)(4) claim is Count III.  (Doc. 1).  Henceforth the Court will refer to them accordingly.

-8-

Defendant to act as manager of Maple Village and Decatur LLC, and would have had the opportunity to stop the foreclosure sales. (Doc. 1, ¶¶ 47 and 64).

Defendant filed a motion to dismiss Counts II and III.[7] (Doc. 9). She argues that Count II should be dismissed because the MV Plaintiffs have not adequately alleged reliance on the false financial statements. (Doc. 9, pp. 11-13; Doc. 14, p. 3). She argues that Count III should be dismissed because the Plaintiffs have not alleged the existence of an express trust. (Doc. 9, pp. 13-16; Doc. 14, pp. 4-5).

The Plaintiffs respond that Count II is adequate because Defendant sent them numerous other false financial documents. They assert that they relied on the post-foreclosure statement because they continued to pay Defendant's management fees and lost their chance to redeem Maple Village Apartments.[8] (Doc. 12, pp. 9-10). Regarding Count III, they argue that the requisite fiduciary relationship with Defendant existed, and that Defendant has failed to address the Courtyard Plaintiffs' embezzlement claim. (Doc. 12, pp. 10-13).

---

[7] Defendant initially moved to dismiss Count I as well. (Doc. 9, pp. 5-10). However, she withdrew her motion as to Count I in her reply brief. (Doc. 14, p. 2).

[8] Alabama provides a one-year statutory right of redemption after a foreclosure sale from a mortgage. ALA. CODE § 6-5-248(b).

Case 16-03007    Doc 15    Filed 06/06/16    Entered 06/06/16 16:23:14    Desc Main
Document    Page 9 of 25

## II. ANALYSIS

### A. Jurisdiction and Adjudicatory Power

The Court has "arising under" jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and the District Court's General Order of Reference dated April 25, 1985. Determinations of dischargeability of particular debts are core proceedings. 28 U.S.C. § 157(b)(2)(I).

### B. Plaintiffs' Standing and Pleading Requirements for Derivative Actions

Though not raised by Defendant, the Court notes that Maple Village and Decatur LLC are not listed as plaintiffs in this adversary proceeding. Alabama law provides that "[a]ll property originally contributed to [a] limited liability company or subsequently acquired by a limited liability company . . . is limited liability company property" and that "[a] member has no interest in specific limited liability company property." ALA. CODE § 10-12-23(b). The allegations in the complaint revolve around the loss of property belonging to Maple Village and Decatur LLC, raising the specter that most of the Plaintiffs lack standing.

Alabama authorizes members of a limited liability company to bring derivative actions if the company's manager refuses to do so or if an effort to cause the manager to bring the action is not likely to succeed. ALA. CODE § 10-12-25(a). As manager of Maple Village and Decatur LLC, Defendant would presumably not authorize them to sue her, necessitating a derivative action by the other members. The complaint fails to satisfy the pleading requirements for derivative actions in federal court. *See* FED. R. CIV. P. 23.1, as incorporated by FED. R.

-10-

BANKR. P. 7023.1.[9] Specifically, the complaint fails to allege with particularity "any effort by the plaintiff[s] to obtain the desired action from directors or comparable authority" or explain "the reasons for not obtaining the action or not making the effort." *See* FED. R. CIV. P. 23.1(b)(3). However, these pleading deficiencies do not implicate the Court's subject-matter jurisdiction, *see* FED. R. CIV. P. 23.1(b)(2), and the Defendant did not raise this issue in her motion to dismiss. Therefore, the Court concludes for the purpose of deciding this motion that the Plaintiffs have standing to bring this adversary proceeding and that the complaint's pleading deficiencies under Rule 23.1(b) do not preclude the Court's consideration of the merits of the complaint.

## C. Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure, as incorporated by FED. R. BANKR. P. 7012(b), authorizes a court to dismiss complaints that fail to "state a claim upon which relief can be granted." A court's analysis of a complaint in the context of a motion to dismiss is a two-step process. First, the court must identify, and cull, pleadings that are mere legal conclusions or "[t]hreadbare recitals of the elements of a cause of action," for such pleadings "are not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

---

[9] "This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." FED. R. CIV. P. 23.1(a).

"[S]tating such a claim requires a complaint with enough factual matter (taken as true)" "to raise a right to relief above the speculative level," *i.e.*, the complaint must be "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. A "well-pleaded complaint may proceed even if it strikes a savvy judge that the actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556.

In addition, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b), as incorporated by FED. R. BANKR. P. 7009. Satisfaction of Rule 9(b) "requires that the time, place, and nature of the misrepresentation be set forth so that the defendant's intent to defraud is evident in the complaint." Flexi-Van Leasing, Inc. v. Perez (In re Perez), 173 B.R. 284, 294 (Bankr. E.D.N.Y. 1994); *see also* Jou v. Adalian (In re Adalian), 474 B.R. 150, 158 (Bankr. M.D. Pa. 2012) (fraud complainant should state the "who, what, when, where and how of the events at issue"). Rule 9(b) is intended to provide defendants notice of the fraud claims against them, protect their reputations, and prevent frivolous suits intended to compel settlements. Adalian, 474 B.R. at 158-59; Perez, 173 B.R. at 294.

Rule 9(b) "should, nevertheless, be read broadly in view of FED. R. CIV. P. 8(a) which requires only a short, plain statements of the claims for relief." Perez, 173 B.R. at 294; *cf.* Adalian, 474 B.R. at 159 (noting that strict application of Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud"). Therefore, "the federal pleader alleging fraud 'need only set forth the basic outline of the scheme, who made what representation and the general time and place of such misrepresentations,' in order to adequately alert the defendant of the purported fraud he is defending against." Zamora v. Jacobs (In re Jacobs), 403 B.R. 565, 573-74 (Bankr. N.D. Ill. 2009) (quoting Caliber Partners, Ltd. v. Affeld, 583 F. Supp. 1308, 1311 (N.D. Ill. 1984)).

### D. Count II – Materially False Written Statement of Financial Affairs

A debt is non-dischargeable if it is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing –

> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive[.]"

11 U.S.C. § 523(a)(2)(B); *see also* Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994). In other words, a debt is non-dischargeable when it "follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied." Field v. Mans, 516 U.S. 59, 66 (1995). In making

this determination, a "bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive. Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent to deceive." Miller, 39 F.3d at 305 (internal quotation marks, misspelling and "[sic]" notation, and brackets omitted).

Defendant argues that Count II should be dismissed because there is no indication from the complaint that any transfers of money or extensions of credit occurred after August 12, 2013, when Defendant provided the false financial statements to Kern.[10] (Doc. 9, pp. 12-13). The Plaintiffs first respond that Defendant "ignores the myriad of other pre-foreclosure fraudulent financial documents that she provided to the Plaintiffs[,]" and refer to "intermittent monthly, quarterly and annual financial statements" provided by Defendant. (Doc. 12, p. 9). Defendant can be forgiven for ignoring these "myriad" other financial statements because they are not mentioned with any specificity in the complaint. To the extent the complaint obliquely references financial statements other than the August 2013 statement, it fails to put either the Defendant or the Court on notice that these statements form the basis for a claim under § 523(a)(2)(B). Such pleading falls well short of the minimum required by Rule 9(b).

---

[10] As noted above, the complaint fails to satisfactorily explain what, if any, connection exists between the Kerns, the Pridgens, and John Simmons on one hand, and the MV Plaintiffs on the other hand. Supra note 4. However, at this stage of the litigation the Court may infer that there is a connection. Congress's use of the term "published" in § 523(a)(2)(B)(iv) contemplates dissemination of false financial statements from the debtor to a creditor through third-party intermediaries. See BLACK'S LAW DICTIONARY 1268 (8th ed. 2004) (defining "publish" as "[t]o distribute copies (of a work) to the public").

-14-

The allegation regarding the August 2013 statement is another matter. The existence of the statement has been pled with sufficient particularity, and a statement purporting to show the financial activity of property after it had been lost in foreclosure would presumptively be false. The circumstances evince an intent on Defendant's part to deceive the Plaintiffs, and Maple Village is an insider of Defendant. *See* 11 U.S.C. § 101(31)(A)(iv) (defining "insider" when the debtor is an individual as a "corporation of which the debtor is a director, officer, or person in control").

Defendant's lack-of-reliance argument rests on the unremarkable assumption that the Plaintiffs are not clairvoyant; in other words, reliance under § 523(a)(2)(B) requires a creditor to demonstrate a transfer of property or extension of credit occurring *after* the false financial statement was published. *See* <u>Beneficial of Mo., Inc. v. Shurbier (In re Shurbier)</u>, 134 B.R. 922, 925 (Bankr. W.D. Mo. 1991) (rejecting fraud claim based on pre-approved credit extension). The Plaintiffs argue that they relied on the August 2013 statement by not removing Defendant from her management responsibilities, which enabled her to continue to be compensated for those duties. (Doc. 12, p. 10). However, nothing in the complaint adequately indicates that Defendant received compensation after August 2013, explains how Defendant was being compensated for her management services, nor even suggests that she was being compensated for such services at all.

The Plaintiffs also argue they relied on the false statements by remaining unaware of the foreclosure sale, thereby losing the opportunity to redeem the Maple Village Apartments. (Doc. 12, pp. 9-10); *supra* note 8. Yet nothing in the complaint suggests that Defendant obtained any

benefit from the MV Plaintiffs' loss of their redemption rights. The Eleventh Circuit still "requires that the debtor gain a *benefit* from the [property] that was obtained by fraudulent means." HSSM # 7 Ltd. P'ship v. Bilzerian (In re Bilzerian), 100 F.3d 886, 890 (11th Cir. 1996) (emphasis in original).[11] In light of the Supreme Court's subsequent decision in Cohen v. de la Cruz, 523 U.S. 213 (1998),[12] the Ninth Circuit has questioned the continued viability of Bilzerian. *See* Muegler v. Bening, 413 F.3d 980, 983 (9th Cir. 2005) (holding that § 523(a)(2)(A) does not require that the debtor gain a benefit); *see also* Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.), 239 F.3d 746, 749-51 (5th Cir. 2001) (same); *cf.* Pleasants v. Kendrick (In re Pleasants), 219 F.3d 372, 375 (4th Cir. 2000) (noting that Cohen "is broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor"); *but see* Nunnery v. Rountree (In re Rountree), 478 F.3d 215, 221-22 (4th Cir. 2007) (distinguishing Cohen and Pleasants and holding that a debtor must have "obtained something" for a § 523(a)(2)(A) claim to succeed); *cf.* Grogan v. Garner, 498 U.S. 279, 282 n.2 (1991) (suggesting that "cases in which the de[btor] did not obtain money, property, or services from the plaintiffs . . . are more appropriately governed by [11 U.S.C.] § 523(a)(6)").

More recently, the Supreme Court has suggested that the "obtained by" requirement need not be limited to the debtor; *i.e.*, when property is obtained by those in league with the debtor as a

---

[11] Bilzerian was an adversary proceeding under § 523(a)(2)(A). Bilzerian, 100 F.3d at 890. However, the operative statutory language – "to the extent obtained by" – applies to both §§ 523(a)(2)(A) and (a)(2)(B). *See* 11 U.S.C. § 523(a)(2).

[12] The Supreme Court held in Cohen that an award of punitive damages based on fraud was non-dischargeable under § 523(a)(2)(A) even though the debtor had not "obtained" that money, explaining that the statute "does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge." Cohen, 523 U.S. at 218.

result of the debtor's fraud, the requirement is met for a finding of non-dischargeability under § 523(a)(2).  *See* Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581, 1589 (2016).  However, the complaint makes no allegation that Defendant was in league with either the Lenders or the entity that purchased Maple Village Apartments at the foreclosure sale, and nothing in Husky International Electronics suggests that the "obtained by" requirement has been abrogated altogether.  *See* id. n.3 (remanding with instructions to determine whether the "obtained by" requirement was met).

Because neither Cohen nor Husky International Electronics abrogated Bilzerian, and because the Eleventh Circuit has not recognized any abrogation of Bilzerian, this Court is bound to follow it.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc); *see also* Kondapalli v. DeMasi (In re DeMasi), 2015 WL 3956135, *7 (Bankr. M.D. Fla. Jun. 26, 2015) (holding that Cohen did not abrogate the requirement that the debtor receive a benefit under § 523(a)(2)(A)).  The Plaintiffs have not adequately alleged how Defendant obtained a benefit from their lost redemption right, so that loss cannot support an inference that the Plaintiffs relied on the August 2013 financial statement.  Accordingly, the Court will dismiss Count II of the complaint.

### E.  Count III – Fiduciary Defalcation or Embezzlement

A debtor cannot discharge a debt that arises out of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"  11 U.S.C. § 523(a)(4).  "Under this section, fraud or defalcation are actionable only if the debtor was a fiduciary of the creditor; whereas, embezzlement or larceny are actionable whether or not the debtor was a fiduciary."  Ford Motor

Credit Co. v. Talcott (In re Talcott), 29 B.R. 874, 878 (Bankr. D. Kan. 1983). The Plaintiffs do not allege larceny, focusing instead on fiduciary defalcation and embezzlement. These causes of action comprise different inquiries and must be analyzed separately.

### 1. Fiduciary Defalcation

A creditor seeking to hold a debt non-dischargeable due to fiduciary defalcation must prove three elements: "(1) the debtor stood in a fiduciary relationship with the creditor; (2) the fiduciary relationship existed prior to the creation of the debt; and (3) the debt resulted from an act of defalcation." Chase Bank USA, N.A. v. Nelms (In re Nelms), 2014 WL 3700511, *12 (Bankr. M.D. Ala. Jul. 24, 2014) (citing Quaif v. Johnson, 4 F.3d 950, 953-55 (11th Cir. 1993)). A fiduciary relationship under § 523(a)(4) requires the existence of a trust.[13] Infinity Group, LLC v. Lucas (In re Lucas), 477 B.R. 236, 242 (Bankr. M.D. Ala. 2012). "The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists."[14] LSP Inv. P'ship v. Bennett (In re Bennett), 989 F.2d 779, 784 (5th Cir. 1993) (citing Angelle v. Reed (In re Angelle), 610 F.2d 1335, 1339 (5th Cir. 1980)).

---

[13] Outside the § 523(a)(4) context, this Court has listed three elements of a trust: "'(1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries.'" Darby v. McGregor (In re Darby), 226 B.R. 126, 129 (Bankr. M.D. Ala. 1998) (quoting RESTATEMENT (THIRD) OF TRUSTS, § 2, cmt. f (1996)).

[14] Defendant argues that state law is irrelevant in determining whether a fiduciary relationship exists. (Doc. 9, p. 15). The Court disagrees. The Eleventh Circuit held in Quaif that a state statute was adequate to create the requisite fiduciary relationship under § 523(a)(4). Quaif, 4 F.3d at 954. As explained in Bennett, state law shapes the scope of fiduciary relationships, subject to the limitations imposed by federal law. Bennett, 989 F.2d at 784-85.

-18-

### a. Fiduciary Relationship

Because the fiduciary relationship must precede the creation of the debt, so must the trust; therefore, a constructive or resulting trust serving "as the remedy for some dereliction of duty" does not create a fiduciary relationship under § 523(a)(4). Quaif, 4 F.3d at 953; *see also* Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934). Rather, the fiduciary relationship contemplated by § 523(a)(4) must be created either by an express trust or a technical trust. Bennett, 989 F.2d at 784 (citing Angelle, 610 F.2d at 1338). "Express trusts are voluntary trusts created by contract." Nevels v. Caples (In re Caples), 454 B.R. 191, 198 (Bankr. N.D. Ala. 2011). They "must generally be in writing and must express the parties [sic] intent to create a trust, specifically define the trust property, and name both a beneficiary and a trustee." Id. "Technical trusts include relationships in which trust-type obligations are imposed pursuant to statute or common law." Id. The Eleventh Circuit's scant case law on § 523(a)(4) suggests that technical trusts are to be narrowly construed. *Compare* Quaif, 4 F.3d at 954 (state statute expressly imposing fiduciary duty on licensed insurance agent to promptly remit payments to insurer created § 523(a)(4) fiduciary relationship), *with* Guerra v. Fernandez-Rocha (In re Fernandez-Rocha), 451 F.3d 813, 818 (11th Cir. 2006) (state statute requiring licensed physician to maintain escrow account, malpractice insurance, or a letter of credit did not create § 523(a)(4) fiduciary relationship with patient). Finally, both express and technical trusts require the transfer of trust property to the debtor. Lucas, 477 B.R. at 244.

Defendant argues that Count III should be dismissed because there is no express or technical trust alleged in the complaint. (Doc. 9, p. 15). The Court agrees that the Plaintiffs have

not adequately alleged an express trust.  Although the complaint mentions that Defendant was "appointed" as the manager of Maple Village and Decatur LLC, and that Sycamore was contractually made "responsible for the management" of Maple Village Apartments and Courtyard Apartments, these allegations are too vague for the Court to be able to infer that the parties intended a fiduciary relationship.  Tellingly, the complaint offers a cacophony of contractual provisions that seemingly have little relevance to the legal issues in this case – such as the rules for admitting new members to Maple Village and Decatur LLC – but is resoundingly silent about Defendant's managerial responsibilities and the nature of her relationship with the Plaintiffs.

Relying on Bennett, the Plaintiffs nevertheless argue that a technical trust exists.  (Doc. 12, pp. 11-12).  The Fifth Circuit held in Bennett that under Texas law the managing partner of the managing partner of a limited partnership owed the requisite fiduciary duty under § 523(a)(4) to the limited partners of the partnership.  Bennett, 989 F.2d at 788-90; *see also* Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986) (finding requisite fiduciary relationship under California law between equal partners in a general partnership).  Bennett is factually analogous and persuasive in its reasoning, but this Court must look to Alabama law to determine whether the requisite technical trust exists.

The leading case in Alabama on the scope of fiduciary duties for managers of a limited liability company appears to be Harbison v. Strickland, 900 So. 2d 385 (Ala. 2004).  In Harbison, a mother formed a limited liability company as part of an estate plan and transferred 83% membership to her daughter, but retained the remaining 17% membership as well as managerial

responsibilities. <u>Harbison</u>, 900 So. 2d at 387. When the mother transferred some of the company's land to her son (who was not a member), the daughter sued her for breach of her fiduciary duties. <u>Id.</u> The trial court entered summary judgment in the mother's favor based on the plain language of the company's operating agreement. <u>Id.</u> at 388. The Alabama Supreme Court reversed, explaining that the trial court was obligated to consider the duties imposed by the Alabama Limited Liability Company Act ("ALLCA"), ALA. CODE §§ 10-12-1 *et seq.*, and that a company's operating agreement could not contractually abrogate those duties. <u>Harbison</u>, 900 So. 2d at 389-91.

The ALLCA imposes on managers the duties of loyalty and care, which include "account[ing] to the limited liability company and . . . hold[ing] as trustee for it any property, profit, or benefit derived . . . in the conduct . . . of the limited liability company's business[,]" as well as "refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law." ALA. CODE §§ 10-12-21(f)(1) and (g), as incorporated by § 10-12-21(k)(2). The ALLCA also prevents a company's operating agreement from "[u]nreasonably restrict[ing] a right to information or access to records[,]" from "[e]liminating the duty of loyalty[,]" or from "[u]nreasonably reduc[ing] the duty of care. . . ." ALA. CODE § 10-12-21(*l*)(1)-(3). These statutory duties are more analogous to the statute in <u>Quaif</u> than the one in <u>Fernandez-Rocha</u>.

The Court concludes that under <u>Harbison</u> and the ALLCA, Defendant's appointment as manager of Maple Village and Decatur LLC created technical trusts that were sufficient, at least at this procedural posture, to create the requisite fiduciary relationship under § 523(a)(4).

-21-

### b. Defalcation

The Eleventh Circuit broadly defines "defalcation" as "a failure to produce funds entrusted to a fiduciary." <u>Quaif</u>, 4 F.3d at 955. To be actionable under § 523(a)(4), this failure must either (1) "involve bad faith, moral turpitude, or other immoral conduct," or (2) must be "intentional." <u>Bullock v. BankChampaign, N.A.</u>, 133 S. Ct. 1754, 1759 (2013). "Intentional" in this context includes reckless conduct in which "the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." <u>Id.</u> (quoting ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)). "That risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'" <u>Id.</u> at 1760 (quoting Model Penal Code § 2.02(2)(c), at 226) (emphasis in original).

The Court readily concludes that the complaint alleges defalcation with the requisite intent. At a minimum, Defendant was obligated to inform the MV Plaintiffs that the note on the Maple Village Apartments fell into default and then foreclosure; her failure to do so clearly demonstrates a "conscious disregard" to a "substantial and unjustifiable risk" that she would breach her fiduciary duties. The complaint also includes allegations of self-dealing and commingling of funds. In short, the Plaintiffs have stated a claim for fiduciary defalcation under § 523(a)(4).

## 2. Embezzlement

"Bankruptcy courts define embezzlement as the 'fraudulent appropriation of property of another by a person to whom such property has been entrusted or to whose hands it has lawfully come.'" Matter of Weber, 892 F.2d 534, 538 (7th Cir. 1989) (quoting Moore v. United States, 160 U.S. 268, 269 (1895)); *see also* Belfry v. Cardozo (In re Belfry), 862 F.2d 661, 662 (8th Cir. 1988). A creditor proves embezzlement by showing that (1) "he entrusted property to the debtor," (2) "the debtor appropriated the property for a use other than that for which it was entrusted," and (3) "the circumstances indicate fraud." Brady v. McAllister (In re Brady), 101 F.3d 1165, 1173 (6th Cir. 1996). "Embezzlement differs from larceny only in that the initial taking of the property was lawful, or with the owner's consent." In re Cunningham, 482 B.R. 444, 448 (Bankr. N.D. Ala. 2012); *see also* Moore, 160 U.S. at 269-70. "Debts which arise from simple conversion are not excepted from discharge." Matter of Stentz, 197 B.R. 966, 985 (Bankr. D. Neb. 1996) (citing Weber, 892 F.2d at 539). Instead, the creditor must show that the misappropriation was done with fraudulent intent. Cunningham, 482 B.R. at 448; In re Dobek, 278 B.R. 496, 509 (Bankr. N.D. Ill. 2002) (citing In re Rigsby, 152 B.R. 776, 778 (Bankr. M.D. Fla. 1993)). "Fraudulent intent may be inferred from surrounding circumstances and the conduct of the accused." Cunningham, 482 B.R. at 448.

The complaint never expressly uses the term "embezzlement" and Defendant does not address embezzlement in her motion to dismiss. However, the complaint includes the following allegation:

> Unbeknownst to Courtyard Plaintiffs at the time, Debtor also
> fraudulently used capital of [Decatur LLC] for her personal benefit.

> The Courtyard Operating account statements, as corroborated by
> Debtor's testimony at her [§] 341 hearing, reflect that Debtor used
> funds of Decatur [LLC] to pay for her personal expenses and to
> buy assets that Debtor personally used. These expenses included
> jewelry, out-of-town travel expenses, and tuition at show choir
> camp, among other items.

(Doc. 1, pp. 15-16, ¶ 59). That is a clear allegation of embezzlement. The Court can plausibly

infer that, as Decatur LLC's manager, Defendant would have been lawfully entrusted with

Decatur LLC's finances (*i.e.*, the Courtyard Plaintiffs' investments in Decatur LLC). The Court

can also plausibly infer that Defendant's managerial responsibilities did not authorize her to use

Decatur LLC's finances to pay for her personal expenses. Finally, some of the items Defendant

allegedly spent Decatur LLC's money on, such as jewelry and show choir camp tuition, are of a

nature that at this procedural posture the Court can presume fraudulent intent; *i.e.*, the items are

not of a nature that a person acting innocently would spend another's money on. The Courtyard

Plaintiffs have adequately alleged a claim of embezzlement under § 523(a)(4).


### III. CONCLUSION

The Court will grant Defendant's motion to dismiss Count II of the Plaintiffs' complaint

because the Plaintiffs have not plausibly alleged that they relied on the August 2013 financial

statement. However, the Plaintiffs have asserted plausible claims of fiduciary defalcation and

embezzlement under 11 U.S.C. § 523(a)(4), so the Court will deny Defendant's motion as to

Count III.  The Court will enter a separate order consistent with this opinion.

Done this 6th  day of June, 2016.

United States Bankruptcy Judge

c: All parties listed.